# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FLAVIO NUNEZ-REYES, aka Flavio
Reyes,

                              *Petitioner,*

              v.

ERIC H. HOLDER JR., Attorney
General,

                              *Respondent.*

No. 05-74350
B.I.A. No.
A078-181-648

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted En Banc
December 14, 2010—Pasadena, California

Filed July 14, 2011

Before: Alex Kozinski, Chief Judge, Mary M. Schroeder,
Betty B. Fletcher, Harry Pregerson,
Diarmuid F. O'Scannlain, Sidney R. Thomas,
Susan P. Graber, Kim McLane Wardlaw,
Consuelo M. Callahan, Milan D. Smith, Jr., and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Graber;
Partial Concurrence and Partial Dissent by Judge Ikuta;
Dissent by Judge Pregerson

9477

## COUNSEL

Frank P. Sprouls, Law Office of Ricci & Sprouls, San Francisco, California, for the petitioner.

Holly M. Smith and Keith I. Bernstein, U.S. Department of Justice, Office of Immigration Litigation, Washington, D.C., for the respondent.

Theshia Naidoo, Drug Policy Alliance, Berkeley, California; Jayashri Shrikantiah, Stanford Law School Immigrants' Rights Clinic, Stanford, California; and Stephen W. Manning, Immigrant Law Group PC, Portland, Oregon, for Amici Curiae.

## OPINION

GRABER, Circuit Judge:

Petitioner Flavio Nunez-Reyes, a native and citizen of Mexico, petitions for review of the Board of Immigration Appeals' ("BIA") decision denying his application for cancellation of removal. We deny the petition. In the course of doing so, sitting as an en banc court, we overrule our equal protection holding in *Lujan-Armendariz v. INS*, 222 F.3d 728 (9th Cir. 2000). We also conclude that, in light of the equities and other considerations, we will apply today's new rule only prospectively.*

### FACTUAL AND PROCEDURAL HISTORY

Petitioner entered the United States in 1992. In 2001, he was charged in state court with one felony count of possession of methamphetamine, in violation of California Health and Safety Code section 11377(a), and one misdemeanor count of being under the influence of methamphetamine, in violation of California Health and Safety Code section 11550(a). He pleaded guilty to both counts, but the state court eventually dismissed the charges under California Penal Code section 1210.1(e)(1), *held unconstitutional in other part by Gardner v. Schwarzenegger*, 101 Cal. Rptr. 3d 229 (Ct. App. 2009). Under that provision, the state court "shall . . . set aside [the conviction] and . . . dismiss the indictment" if the defendant successfully completes a drug treatment program and meets other conditions. Cal. Penal Code § 1210.1(e)(1). "[E]xcept as provided [in other subsections], both the arrest and the conviction shall be deemed never to have occurred." *Id.*

In early 2002, the federal government issued a notice to

---

*Chief Judge Kozinski and Judges Schroeder, Thomas, Wardlaw, and M. Smith join all Parts of this Opinion. Judges O'Scannlain, Callahan, and Ikuta join Part A only. Judge B. Fletcher joins Part B only.

appear, charging Petitioner with being removable. Petitioner conceded removability but applied for adjustment of status and cancellation of removal. The immigration judge ("IJ") denied all forms of relief and ordered Petitioner removed. The IJ held that the state convictions rendered Petitioner ineligible for any form of relief even though the state court later had dismissed the convictions. The BIA affirmed the IJ's decision.

Petitioner timely petitioned for review. A three-judge panel granted the petition because of our rule, first announced in *Lujan-Armendariz*, that "equal protection requires us to treat the expungement of a state conviction for simple possession in the same manner" as the expungement of a federal conviction for simple possession. *Nunez-Reyes v. Holder*, 602 F.3d 1102, 1104 (9th Cir. 2010) (per curiam). Judge Graber wrote separately to state reasons why we should revisit the rule announced in *Lujan-Armendariz*. *See id.* at 1105 (Graber, J., concurring) (citing *Rice v. Holder*, 597 F.3d 952, 957-58 (9th Cir. 2010) (Ikuta, J., concurring) (arguing that we should revisit this rule); *Ramirez-Altamirano v. Holder*, 563 F.3d 800, 816-17 (9th Cir. 2009) (Ikuta, J., dissenting) (same); *Dillingham v. INS*, 267 F.3d 996, 1012-13 (9th Cir. 2001) (Fernandez, J., dissenting) (suggesting that the *Lujan-Armendariz* rule is incorrect but concluding that, "for purposes of this case, that is neither here nor there")).

We then granted rehearing en banc. *Nunez-Reyes v. Holder*, No. 05-74350, 2010 WL 3816719 (9th Cir. Sept. 24, 2010) (order).

## STANDARD OF REVIEW

We review de novo the BIA's determination "that a controlled substance conviction precludes immigration relief as a matter of law." *Ramirez-Altamirano*, 563 F.3d at 804.

DISCUSSION

A.   *We overrule* Lujan-Armendariz.

Does a state-court conviction for a simple-possession drug crime, later expunged by the state court, nevertheless constitute a "conviction" for federal immigration purposes? History has provided an ever-changing answer to that question. *See In re O-T-*, 4 I. & N. Dec. 265, 268 (B.I.A. 1951) ("yes"); *In re A-F-*, 8 I. & N. Dec. 429, 445 (Att'y Gen. 1959) ("no"); *In re Werk*, 16 I. & N. Dec. 234, 235-36 (B.I.A. 1977) ("yes, in some circumstances"); *Garberding v. INS*, 30 F.3d 1187, 1190-91 (9th Cir. 1994) ("no"); *In re Manrique*, 21 I. & N. Dec. 58, 62-64 (B.I.A. 1995) ("no"). Against that backdrop, in 1996, Congress enacted significant changes to our immigration laws, which included a new definition of the term "conviction." 8 U.S.C. § 1101(a)(48)(A).[1]

In *Lujan-Armendariz*, we addressed the effect of the new definition on a petitioner's expunged state conviction for a simple-possession drug crime. We began by considering whether a *federal* conviction, later expunged under the Federal First Offender Act ("FFOA"), nevertheless constitutes a "conviction" for immigration purposes. Importantly, the FFOA mandates that a successfully expunged federal conviction "*shall not be considered a conviction* for the purpose of a disqualification or a disability imposed by law upon convic-

---

[1]The full definition states:

The term "conviction" means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—

(i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and

(ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

8 U.S.C. § 1101(a)(48)(A).

tion of a crime, or *for any other purpose*." 18 U.S.C. § 3607(b) (emphases added). We thoroughly examined the apparent conflict between the quoted text of the FFOA and the new definition of "conviction." *Lujan-Armendariz*, 222 F.3d at 734-43.

[1] But we relegated to a footnote a very important additional step in the analysis: Did Congress have a rational basis for distinguishing between expunged federal convictions and expunged state convictions? We answered as follows: "INS counsel offered no reason, and we cannot conceive of any, why Congress would have wanted aliens found guilty of federal drug crimes to be treated more leniently than aliens found guilty of state drug crimes." *Id.* at 743 n.24. Our brief analysis of this important issue is understandable in light of the government's silence. But we now are persuaded that we erred.[2]

[2] Since our decision in *Lujan-Armendariz*, the BIA and every sister circuit to have addressed the issue—eight in total —have rejected our holding. *In re Salazar-Regino*, 23 I. & N. Dec. 223, 235 (B.I.A. 2002) (en banc); *Wellington v. Holder*, 623 F.3d 115, 120-21 (2d Cir. 2010) (per curiam), *cert. denied*, 79 U.S.L.W. 3442 (U.S. June 6, 2011) (No. 10-933); *Danso v. Gonzales*, 489 F.3d 709, 716 (5th Cir. 2007); *Ramos v. Gonzales*, 414 F.3d 800, 805-06 (7th Cir. 2005); *Resendiz-Alcaraz v. U.S. Att'y Gen.*, 383 F.3d 1262, 1271-72 (11th Cir. 2004); *Elkins v. Comfort*, 392 F.3d 1159, 1163-64 (10th Cir. 2004); *Acosta v. Ashcroft*, 341 F.3d 218, 224-27 (3d Cir. 2003); *Vasquez-Velezmoro v. INS*, 281 F.3d 693, 697-98 (8th Cir. 2002); *Herrera-Inirio v. INS*, 208 F.3d 299, 304-09 (1st Cir. 2000). The BIA held:

---

[2]We address here only our holding in *Lujan-Armendariz* that the constitutional guarantee of equal protection required Congress to treat expunged federal convictions and expunged state convictions the same way. As we did in *Lujan-Armendariz*, we assume, without deciding, that the statutory term "conviction" includes expunged state convictions. Because this case does not require resolution of that issue, we do not reach it.

After considering the analysis set forth in *Lujan-Armendariz* . . . , we decline to apply the ruling in that decision to cases arising outside of the jurisdiction of the Ninth Circuit. We therefore conclude that, except in the Ninth Circuit, a first-time simple drug possession offense expunged under a state rehabilitative statute is a conviction under [the immigration laws].

*In re Salazar-Regino*, 23 I. & N. Dec. at 235.

[3] Having reconsidered the issue, we now agree with the BIA and our sister circuits. A very relaxed form of rational basis review applies to this inquiry: "[F]ederal classifications based on alienage are subject to relaxed scrutiny. Federal classifications distinguishing among groups of aliens thus are valid unless wholly irrational." *Garberding*, 30 F.3d at 1190 (citation and internal quotation marks omitted); *see also Abebe v. Mukasey*, 554 F.3d 1203, 1206 (9th Cir. 2009) (en banc) (per curiam) ("Congress has particularly broad and sweeping powers when it comes to immigration, and is therefore entitled to an additional measure of deference when it legislates as to admission, exclusion, removal, naturalization or other matters pertaining to aliens."), *cert. denied*, 130 S. Ct. 3272 (2010). That standard easily is met here. The Third Circuit put it well:

Familiar with the operation of the federal criminal justice system, Congress could have thought that aliens whose federal charges are dismissed under the FFOA are unlikely to present a substantial threat of committing subsequent serious crimes. By contrast, Congress may have been unfamiliar with the operation of state schemes that resemble the FFOA. Congress could have worried that state criminal justice systems, under the pressure created by heavy case loads, might permit dangerous offenders to plead down to simple possession charges and take advan-

tage of those state schemes to escape what is considered a conviction under state law. Particularly in view of Congress's power in immigration matters, it seems plain that rational-basis review is satisfied here.

*Acosta*, 341 F.3d at 227. Another rational basis exists as well:

Not all states permit expungement. A person convicted in such a state would be ineligible for relief under the immigration laws, whereas a person convicted in a different state would be eligible. Congress reasonably could have concluded that, in the strong interest of uniformity, it would not recognize *any* state expungements rather than adopt a piecemeal approach.

*Nunez-Reyes*, 602 F.3d at 1107 (Graber, J., concurring).

**[4]** In conclusion, we hold that the constitutional guarantee of equal protection does not require treating, for immigration purposes, an expunged state conviction of a drug crime the same as a federal drug conviction that has been expunged under the FFOA. We therefore overrule *Lujan-Armendariz*'s holding to the contrary. By necessity, we also overrule the same holding in those cases that, bound by *stare decisis*, followed the rule we announced in *Lujan-Armendariz*. Those cases include *Romero v. Holder*, 568 F.3d 1054 (9th Cir. 2009); *Ramirez-Altamirano*, 563 F.3d 800; *Dillingham*, 267 F.3d 996; and *Cardenas-Uriarte v. INS*, 227 F.3d 1132 (9th Cir. 2000).[3]

---

[3]We do not address, and do not overrule, any other holding of *Lujan-Armendariz* or its progeny, other than *Rice v. Holder*, 597 F.3d 952 (9th Cir. 2010). *See infra* Part C.

B. *We will apply our decision prospectively only.*

**[5]** Having decided to overrule *Lujan-Armendariz*, we next consider whether to apply the new rule of law only prospectively. The default principle is that a court's decisions apply retroactively to all cases still pending before the courts. Federal courts may depart from that default principle only in certain circumstances, as outlined in *Chevron Oil Co. v. Huson*, 404 U.S. 97 (1971). Below, we first explain that the three-factor *Chevron Oil* test remains good law, at least in cases, such as this one, where we announce a new rule of law not affecting our jurisdiction. Balancing the three factors described in *Chevron Oil*, we conclude that we will apply our decision only prospectively.

1. *The* Chevron Oil *test applies.*

The circumstances that justify a deviation from the normal rule of retroactivity have a long jurisprudential history. In the criminal context, the Supreme Court originally held that prospective application was appropriate in some circumstances. *Linkletter v. Walker*, 381 U.S. 618 (1965). But the Court later overruled *Linkletter* in favor of a bright-line rule: In criminal cases, any new rule of law must be applied retroactively. *Griffith v. Kentucky*, 479 U.S. 314 (1987).

In the civil context, the Supreme Court originally announced a three-factor test of general applicability in *Chevron Oil*. Under the *Chevron Oil* test, equitable considerations in some circumstances warrant prospective application of a new rule of law. But the Court has limited, in two relevant ways, the circumstances in which the *Chevron Oil* test applies.

First, a court announcing a new rule of law must decide between pure prospectivity and full retroactivity; what Justice Souter termed "selective prospectivity," in which courts weighed the equities on a case-by-case basis, is foreclosed.

*James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 537-38 (1991) (Souter, J., plurality op.); *see Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749 (1995); *Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 97 (1993) ("When [the Supreme] Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review . . . ."); *Crowe v. Bolduc*, 365 F.3d 86, 93 (1st Cir. 2004) ("In a civil case, then, a court [announcing a new rule of law] has only two available options: pure prospectivity or full retroactivity.").

Second, in cases in which the new rule of law strips the courts of jurisdiction, the courts must apply that new rule of law retroactively. *See United States ex rel. Haight v. Catholic Healthcare W.*, 602 F.3d 949, 953 (9th Cir.) (citing *United States ex rel. Eisenstein v. City of New York*, 129 S. Ct. 2230 (2009); *Bowles v. Russell*, 551 U.S. 205 (2007)), *cert. denied*, 131 S. Ct. 366 (2010); *Felzen v. Andreas*, 134 F.3d 873, 877 (7th Cir. 1998) (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 818 (1988)). "Equitable considerations are altogether irrelevant when a court lacks adjudicatory power." *Felzen*, 134 F.3d at 877.

We glean from this jurisprudential history the following rule of law: We apply the three-pronged test outlined in *Chevron Oil* (1) in a civil case; (2) when we announce a new rule of law, as distinct from applying a new rule that we or the Supreme Court previously announced; (3) and when the new rule does not concern our jurisdiction. *See, e.g.*, *George v. Camacho*, 119 F.3d 1393, 1399 n.9 (9th Cir. 1997) (en banc).[4]

**[6]** Like some of our sister circuits, we acknowledge that

---

[4]To the extent that our decision in *George* contravenes today's holding by applying *Chevron Oil* to circumstances concerning our jurisdiction, we recognize that subsequent Supreme Court decisions overruled it. *Haight*, 602 F.3d at 953; *Felzen*, 134 F.3d at 877.

the Supreme Court's reasoning in cases such as *Harper* could support a conclusion that the *Chevron Oil* test no longer applies in any circumstances: all new rules of law must be applied retroactively. *See, e.g.*, *Kolkevich v. Att'y Gen. of U.S.*, 501 F.3d 323, 337 n.9 (3d Cir. 2007) (observing that, "as some commentators have noted, it is unclear whether we have the power" to apply a new rule of law prospectively in light of *Harper*, but not reaching the issue); *Fairfax Covenant Church v. Fairfax Cnty. Sch. Bd.*, 17 F.3d 703, 710 (4th Cir. 1994) (noting that, in *Harper*, "the Supreme Court cast serious doubt" upon the continuing "vitality" of the *Chevron Oil* test). But the Supreme Court has not overruled the *Chevron Oil* test in the circumstances described above. *See Glazner v. Glazner*, 347 F.3d 1212, 1216-17 (11th Cir. 2003) (en banc) ("Although prospectivity appears to have fallen into disfavor with the Supreme Court [citing *Harper*, *James B. Beam*, and *Griffith*], the Court has clearly retained the possibility of pure prospectivity and, we believe, has also retained the *Chevron Oil* test, albeit in a modified form, as the governing analysis for such determinations in civil cases."); *Fairfax Covenant Church*, 17 F.3d at 710 ("We are struck, however, by the notable absence in *Harper* of any statement that *Chevron [Oil]* is overruled . . . ."); *but see Hulin v. Fibreboard Corp.*, 178 F.3d 316, 333 (5th Cir. 1999) (concluding, in dictum, that "[t]he Court's most recent decisions . . . leav[e] only an indistinct possibility of the application of pure prospectivity in an extremely unusual and unforeseeable case"). As a circuit court, even if "recent Supreme Court jurisprudence has perhaps called into question the continuing viability of [its precedent], we are bound to follow a controlling Supreme Court precedent until it is explicitly overruled by that Court." *United States v. Weiland*, 420 F.3d 1062, 1079 n.16 (9th Cir. 2005) (citation omitted); *see Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). We therefore remain bound by *Chevron Oil*. For that same reason, every court to have decided the issue has concluded that *Chevron Oil* continues to apply. *See Crowe*, 365 F.3d at 94 (applying the *Chevron Oil* test); *Glazner*, 347

F.3d at 1219 (same); *see also Shah v. Pan Am. World Servs., Inc.*, 148 F.3d 84, 91 (2d Cir. 1998) (same). Following our sister circuits and our previous holdings, we too will apply the *Chevron Oil* test when all three of the requirements described above are met.

In this civil case, we announce a new rule of law that does not concern our jurisdiction. The *Chevron Oil* test applies.

>    2.   *Balancing the* Chevron Oil *factors, we will apply the new rule only prospectively*.

**[7]** The three *Chevron Oil* factors are: (1) whether the decision "establish[es] a new principle of law"; (2) "whether retrospective operation will further or retard [the rule's] operation" in light of its history, purpose, and effect; and (3) whether our decision "could produce substantial inequitable results if applied retroactively." 404 U.S. at 106-07 (internal quotation marks omitted). There is no question that our decision today "establish[es] a new principle of law . . . by overruling clear past precedent on which litigants may have relied." *Id.* at 106. *Lujan-Armendariz* clearly announced the rule that equal protection required that we treat expunged state drug convictions as we do expunged federal drug convictions. Just as clearly, we overrule that holding today.

Further, amici assert—and the government does not dispute —that, because of the clarity and consistent application of *Lujan-Armendariz* for more than a decade, aliens and their counsel have acted in reliance on *Lujan-Armendariz*. According to amici, aliens often have pleaded guilty to minor drug crimes and have completed drug treatment in order to have their convictions expunged—all in reliance on *Lujan-Armendariz*'s promise that doing so would spare them from adverse immigration consequences.

"There can be little doubt that, as a general matter, alien defendants considering whether to enter into a plea agreement

are acutely aware of the immigration consequences of their convictions." *INS v. St. Cyr*, 533 U.S. 289, 322 (2001).[5] "[D]eportation is an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes." *Padilla v. Kentucky*, 130 S. Ct. 1473, 1480 (2010) (footnote omitted). "Preserving the client's right to remain in the United States may be more important to the client than any potential jail sentence." *Id.* at 1483 (internal quotation marks and alteration omitted). Accordingly, "the threat of deportation may provide the defendant with a powerful incentive to plead guilty to an offense that does not mandate that penalty." *Id.* at 1486.

Our decision in *Lujan-Armendariz* provided clear assurance that expungement after a plea of guilty to the state crime of simple drug possession would insulate the alien from adverse immigration consequences. "Even if the defendant were not initially aware of [*Lujan-Armendariz*], competent defense counsel, following the advice of numerous practice guides, would have advised him concerning the [decision's] importance." *St. Cyr.*, 533 U.S. at 323 n.50. Indeed, in a situation similar to this one, where the immigration consequences are "succinct, clear, and explicit," the Supreme Court has held that an alien's counsel who fails to inform the alien of those

---

[5]Judge Ikuta asserts that, because *St. Cyr* arose in a different context, all the Supreme Court's statements in that opinion are "inapposite" here. Partial dissent at 9506-07 n.7. As an initial matter, we quote from a wide range of cases arising in many different contexts. For instance, in the next sentence in text, we quote from *Padilla v. Kentucky*, 130 S. Ct. 1473 (2010), but Judge Ikuta expresses no concern about that quotation. More to the point, we simply use the Supreme Court's words to describe the interplay between plea agreements and immigration consequences and the resulting unfairness to aliens when they enter into plea agreements under a misunderstanding of the immigration consequences. The interplay between pleas and consequences—and the resulting unfairness—are the same, whether it is Congress or the courts that pull the rug out from underneath aliens. While *St. Cyr* does not control the analysis of the third *Chevron Oil* factor, the Court's discussion is relevant and instructive.

consequences has provided ineffective assistance. *Padilla*, 130 S. Ct. at 1483.

After our decision today, alien defendants will know that an expunged state-law conviction for simple possession *will* have adverse immigration consequences.[6] Those aliens will be able to make a fully informed decision whether to plead guilty or to exercise their constitutional rights, such as the right to trial by jury. *See St. Cyr*, 533 U.S. at 322 ("In exchange for some perceived benefit, defendants waive several of their constitutional rights (including the right to a trial) and grant the government numerous tangible benefits . . . .").

For those aliens who relied on *Lujan-Armendariz*, however, "[t]he potential for unfairness in the retroactive application" of today's decision "is significant and manifest." *St. Cyr*, 533 U.S. at 323. Those aliens were assured that, after completion of drug treatment, there would be absolutely no legal consequences. Their waiver of their constitutional rights was in reliance on *Lujan-Armendariz*. In these circumstances, we easily

---

[6]We recognize, of course, that nothing is ever guaranteed. There was always some chance, for instance, that Congress would amend the law and apply it retroactively. Similarly, there was some chance that an alien residing in the Ninth Circuit would move and be issued a notice to appear in a different jurisdiction, where *Lujan-Armendariz* does not apply. At oral argument, the government urged us to conclude that any reliance on *Lujan-Armendariz* therefore was only speculative. We disagree; indeed, it is the government's argument that contains speculation. Reliance on the clear, binding precedent of *Lujan-Armendariz* strikes us as entirely reasonable and prudent, particularly in light of Congress' inaction, the Supreme Court's steady denial of certiorari in cases raising this issue, and our own consistent application (and, arguably, expansion) of the precedent in a series of cases spanning more than a decade. Moreover, the Supreme Court has rejected essentially the same argument because "[t]here is a clear difference, for the purposes of [statutory] retroactivity analysis, between facing possible deportation and facing certain deportation." *St. Cyr*, 533 U.S. at 325. In conclusion, aliens' reliance on *Lujan-Armendariz* is not diminished because of some outside chance that they would not receive its benefit.

conclude that the third *Chevron Oil* factor is met: our decision "could produce substantial inequitable results if applied retroactively." *Chevron Oil*, 404 U.S. at 107. It would be manifestly unfair effectively to hoodwink aliens into waiving their constitutional rights on the promise of no legal consequences and, then, to hold retroactively that their convictions actually carried with them the "particularly severe 'penalty' " of removal, *Padilla*, 130 S. Ct. 1481; *cf. Crowe*, 365 F.3d at 94 ("We think that it would be patently unfair to subject a party to a forfeiture for assiduously following binding circuit precedent."); *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 545 (11th Cir. 2002) (en banc) ("It would be inequitable to punish those parties for following the clearly established precedent of this Circuit.").

For similar reasons, we conclude that the second *Chevron Oil* factor is met: In light of the rule's history, purpose, and effect, retroactive application will not further the rule's operation. 404 U.S. at 106-07. As we now make clear, Congress intended that convictions for state-law simple possession have adverse immigration consequences. At first glance, it may appear that retroactive application of today's decision would further that purpose. After all, the state-law convictions occurred, and Congress intended that such convictions have adverse immigration consequences.

But Congress did not intend adverse immigration consequences for those who were merely charged with a crime or suspected of a crime; Congress intended such results only for those who were duly convicted, with all the constitutional protections of our criminal justice system. Relevant here, we think it is a reasonable assumption that Congress intended adverse immigration consequences only for those who were convicted *either* after the exercise of their constitutional rights, such as the right to trial, *or* after an informed waiver of those constitutional rights. As discussed above, many alien defendants fell into neither category. Instead, they pleaded guilty and waived their constitutional rights with a wholly

uninformed understanding of the consequences of their plea. Contrary to their understanding that there would be *no* immigration consequences, the actual consequence is the severe penalty of removal. Nothing in the statute or its history, purpose, or effect suggests that Congress intended adverse immigration consequences for those whose waiver of constitutional rights turned out to be so ill-informed. Indeed, the Supreme Court has instructed that such a gross misunderstanding of the immigration consequences of a plea, when caused by incompetent counsel, rises to the level of a constitutional violation. *Padilla*, 130 S. Ct. at 1486-87. We conclude that retroactive application of our decision today will not further the purposes of the immigration laws.

**[8]** Weighing the *Chevron Oil* factors, we hold that our decision today will apply only prospectively. *Cf. Glazner*, 347 F.3d at 1220 ("If this were truly a situation where the class of persons affected by the new rule would suddenly face a strong likelihood of liability when they faced no possibility of liability before, we would be inclined to view the equities as weighing heavily in favor of pure prospective application."). For those aliens convicted before the publication date of this decision, *Lujan-Armendariz* applies. For those aliens convicted after the publication date of this decision, *Lujan-Armendariz* is overruled.

## C. *We nevertheless deny the petition in this case.*

Because our decision applies only prospectively, we apply the rule announced in *Lujan-Armendariz* to the petition for review in this case. In *Lujan-Armendariz*, we held that an expunged conviction for simple possession did not constitute a "conviction" for immigration purposes. In later cases, we held that an expunged conviction for a "lesser offense" to simple possession also did not constitute a "conviction" for immigration purposes. *Ramirez-Altamirano*, 563 F.3d at 808-09; *Cardenas-Uriarte*, 227 F.3d at 1137. In those cases, it was clear that the conviction was for a "lesser offense"

because the alien was convicted of a single crime that carried a lesser penalty than the crime of simple possession. *See Ramirez-Altamirano*, 563 F.3d at 808 ("The structure of [the alien's] plea agreement obviously was intended to *minimize* his culpability by allowing him to avoid facing the more serious drug possession charge, and reflects the state's view as to the seriousness of the offense.").

[9] Here, however, Petitioner was convicted of being under the influence of methamphetamine. Being under the influence is not a lesser crime than simple possession. Although we have held that possession of paraphernalia is a lesser crime than possession of a drug itself, at least where the defendant pleaded down from an original charge of simple possession, *Cardenas-Uriarte*, 227 F.3d at 1137, being under the influence is not a possession crime at all, and it is thus qualitatively different from any federal conviction for which FFOA treatment would be available. Being under the influence is not a lesser offense to simple possession because it arguably is more serious than mere possession; being under the influence alters one's sober state of mind and carries an immediate risk of dangerous behavior, which mere possession does not necessarily create. For example, one could foolishly agree to hide drugs for a friend, which does not create an immediate risk of dangerous behavior. We therefore overrule *Rice v. Holder*, 597 F.3d 952 (9th Cir. 2010).[7] The BIA did not err.

---

[7]Judge Ikuta argues that, if we are correct about the *Chevron Oil* factors concerning *Lujan-Armendariz*, then we also must overrule *Rice* prospectively only. Partial dissent at 9505-06 & n.6. We disagree. Unlike with respect to *Lujan-Armendariz*, the *Chevron Oil* factors do not support a finding of prospectivity with respect to *Rice*. The parties and amici have presented no evidence that litigants have relied on our very recent decision in *Rice*. *See Chevron Oil*, 404 U.S. at 106 (holding that prospectivity is appropriate where we overrule past precedent "on which litigants may have relied"). This petitioner certainly did not rely on *Rice*, because he pleaded guilty in 2001—nine years before we decided *Rice*. For similar reasons, we are unpersuaded that "substantial inequitable results," *id.* at 107 (internal quotation marks omitted), will result from retroactive application of our decision to overrule the very recent holding in *Rice*.

**Petition DENIED.**

IKUTA, Circuit Judge, with whom Judges O'SCANNLAIN and CALLAHAN join, concurring in part, dissenting in part, and concurring in the judgment:

In overruling the equal protection holding of *Lujan-Armendariz v. INS*, 222 F.3d 728 (9th Cir. 2000), *see* Maj. op. at 9483-86, the majority corrects a longstanding error in our case law, and I concur in both its reasoning and its result. Having corrected one error, however, the majority then commits another, holding that its overruling of *Lujan-Armendariz* will apply prospectively only. Because the majority fails to heed the Supreme Court's warning that prospective decision-making is appropriate (if ever) only in certain circumstances that are not present here, I respectfully dissent from Parts B and C of the majority opinion.

I

In *Harper v. Virginia Department of Taxation*, the Supreme Court's most recent opinion on the prospective application of judicial decisions, the Court expressed grave concerns about whether prospective decisionmaking is ever permissible. 509 U.S. 86, 97-98 (1993). *Harper* represents only the latest in a series of Supreme Court decisions that have severely curtailed the power of courts to engage in prospective decisionmaking and have articulated a more traditional view of the judicial power. *See Am. Trucking Ass'ns, Inc. v. Smith*, 496 U.S. 167, 201 (1990) (Scalia, J., concurring in the judgment) ("[T]he judicial role . . . is to say what the law is, not prescribe what it shall be."); *see also Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("Our general practice is to apply the rule of law we announce in a case to the parties before us. . . . We adhere to this practice even when we overrule a case." (citation omitted)).

The Supreme Court began experimenting with prospective decisionmaking during the 1960s. In *Linkletter v. Walker*, the Court created a doctrine under which courts could deny retroactive effect to a newly announced rule of criminal procedure. 381 U.S. 618, 629 (1965). In *Chevron Oil Co. v. Huson*, it established a similar doctrine for civil cases. 404 U.S. 97, 106-07 (1971). Over the next decade or so, the Supreme Court applied both of these doctrines in a number of cases, justified by a range of rationales of varying strength. *See James B. Beam Distilling Co. v. Georgia* (*Beam*), 501 U.S. 529, 536 (1991) (citing cases); *United States v. Johnson*, 457 U.S. 537, 543-45 (1982) (same).

The Court's return to a more traditional view of judicial power began with *United States v. Johnson*. Expressing dissatisfaction with its prior non-retroactivity jurisprudence and declaring that "[r]etroactivity must be rethought," *Johnson*, 457 U.S. at 548 (quoting *Desist v. United States*, 394 U.S. 244, 258 (1969) (Harlan, J., dissenting)) (internal quotation marks omitted), *Johnson* cut back on *Linkletter* by holding that (subject to certain exceptions) "a decision of th[e] [Supreme] Court construing the Fourth Amendment is to be applied retroactively to all convictions that were not yet final at the time the decision was rendered." *Id.* at 562. It was left to *Griffith v. Kentucky*, however, to bring the era of criminal non-retroactivity to a close. 479 U.S. 314 (1987). In *Griffith*, the Court overruled *Linkletter* and held that "a new rule [of criminal procedure] is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception[s]." *Id.* at 328. In explaining its decision, the Court stated that the *Linkletter* doctrine violated two of the "basic norms of constitutional adjudication." *Id.* at 322. First, it violated the "nature of judicial review" because it allowed a court to decide on a new rule of law but then refuse to "apply that rule to all similar cases pending on direct review." *Id.* at 322-23. Second, *Linkletter*'s "selective application of new rules violate[d] the principle of treating similarly situated [parties] the same." *Id.*

It is true that *Griffith* left the civil non-retroactivity doctrine of *Chevron Oil* untouched. *See id.* at 322 n.8. However, the Court subsequently expressed doubts about the viability of non-retroactivity in the civil context, as well. *See Beam*, 501 U.S. 529 (six Justices disapproving of selective non-retroactivity in the civil context);[1] *Am. Trucking Ass'ns*, 496

---

[1]In an opinion announcing the judgment of the Court, Justice Souter (joined by Justice Stevens) commented: "*Griffith* cannot be confined to the criminal law. Its equality principle, that similarly situated litigants should be treated the same, carries comparable force in the civil context." *Beam*, 501 U.S. at 540 (Souter, J., announcing the judgment of the Court). He further noted:

> Nor, finally, are litigants to be distinguished for choice-of-law purposes on the particular equities of their claims to prospectivity: whether they actually relied on the old rule and how they would suffer from retroactive application of the new. It is simply in the nature of precedent, as a necessary component of any system that aspires to fairness and equality, that the substantive law will not shift and spring on such a basis. To this extent, our decision here does limit the possible applications of the *Chevron Oil* analysis, however irrelevant *Chevron Oil* may otherwise be to this case. Because the rejection of modified prospectivity precludes retroactive application of a new rule to some litigants when it is not applied to others, the *Chevron Oil* test cannot determine the choice of law by relying on the equities of the particular case.

*Id.* at 543. Justice White noted that "if the Court in [*Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984),] thought its decision to have been reasonably foreseeable and hence not a new rule, there would be no doubt that it would be retroactive to all similarly situated litigants." *Id.* at 544-45 (White, J., concurring in the judgment). Justice Blackmun (joined by Justices Marshall and Scalia) wrote:

> I agree that failure to apply a newly declared constitutional rule to cases pending on direct review violates basic norms of constitutional adjudication. It seems to me that our decision in *Griffith* makes clear that this Court's function in articulating new rules of decision must comport with its duty to decide only "Cases" and "Controversies." Unlike a legislature, we do not promulgate new rules to "be applied prospectively only," as the dissent, and perhaps Justice Souter, would have it. The nature of judicial review

U.S. 167 (five Justices rejecting the plurality's civil non-retroactivity analysis).

The Justices' misgivings regarding non-retroactivity in the civil context found expression in the Court's opinion in *Harper*. Justice Thomas, in his opinion for the Court, stated:

> *Beam* controls this case, and we accordingly adopt a rule that fairly reflects the position of a majority of Justices in *Beam*: When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of

---

constrains us to consider the case that is actually before us, and, if it requires us to announce a new rule, to do so in the context of the case and apply it to the parties who brought us the case to decide. To do otherwise is to warp the role that we, as judges, play in a Government of limited powers.

*Id*. at 547 (Blackmun, J., concurring in the judgment) (citations omitted). Justice Scalia (joined by Justices Marshall and Blackmun) wrote:

I think, "[t]he judicial Power of the United States" conferred upon this Court and such inferior courts as Congress may establish must be deemed to be the judicial power as understood by our common-law tradition. That is the power "to say what the law is," not the power to change it. I am not so naive (nor do I think our forebears were) as to be unaware that judges in a real sense "make" law. But they make it *as judges make it*, which is to say *as though* they were "finding" it — discerning what the law *is*, rather than decreeing what it is today *changed to*, or what it will *tomorrow* be. Of course this mode of action poses "difficulties of a . . . practical sort" when courts decide to overrule prior precedent. But those difficulties are one of the understood checks upon judicial law-making; to eliminate them is to render courts substantially more free to "make new law," and thus to alter in a fundamental way the assigned balance of responsibility and power among the three branches.

*Id*. at 549 (Scalia, J., concurring in the judgment) (citations omitted).

whether such events predate or postdate our announcement of the rule.

*Harper*, 509 U.S. at 97. The Court explained that it was imposing this rule to further the same "basic norms of constitutional adjudication" that had caused it to eliminate non-retroactivity in the criminal context in *Griffith*. *Id.* (internal quotation marks omitted). The Court noted that the "general rule of retrospective effect" for judicial decisions has "governed '[j]udicial decision[making] . . . for near a thousand years.' " *Id.* at 94 *(quoting Kuhn v. Fairmont Coal Co.*, 215 U.S. 349, 372 (1910) (Holmes, J., dissenting)). In direct contrast to this general rule, the power to "make rules of law retroactive or prospective as [one] see[s] fit" is "quintessentially" a legislative prerogative. *Id.* at 95; *see also Griffith*, 479 U.S. at 323 ("In truth, the Court's assertion of power to disregard current law in adjudicating cases before us that have not already run the full course of appellate review, is quite simply an assertion that our constitutional function is not one of adjudication but in effect of legislation." (quoting *Mackey v. United States*, 401 U.S. 667, 679 (1971) (Harlan, J., concurring in the judgment)) (internal quotation mark omitted)). Thus, *Harper* said, courts "ha[ve] no more constitutional authority in civil cases than in criminal cases to disregard current law or to treat similarly situated litigants differently." 509 U.S. at 97 (quoting *Am. Trucking Ass'ns*, 496 U.S. at 214 (Stevens, J., dissenting)) (internal quotation mark omitted).

Although the reasons for severely limiting non-retroactive decisionmaking are clearly set out in *Harper*, the Court did not expressly overrule *Chevron Oil*.[2] *See id.* We therefore

---

[2]Whether the Court may have implicitly overruled *Chevron Oil* has been the subject of some debate. *See* Bradley Scott Shannon, *The Retroactive and Prospective Application of Judicial Decisions*, 26 Harv. J. L. & Pub. Pol'y 811, 814 (Summer 2003) (reviewing the Supreme Court's opinions and concluding that the Court has "reverted to a firm rule of retroactive application . . . in the civil arena"). Such a conclusion finds support

must continue to consider *Chevron Oil* where we are announcing a new rule of law for the first time and the parties have fairly raised the issue.[3] *See Agostini*, 521 U.S. at 237. *Harper* nonetheless strongly indicated that purely prospective application of a new rule is disfavored even in this situation. In light of *Harper*'s disapproval of the principle of non-retroactivity, we should interpret the *Chevron Oil* exception to retroactivity as a narrow one and avoid expanding its application.

## II

*Chevron Oil* sets forth three factors we must consider when determining whether a decision should be applied prospectively only. When narrowly construed, as required by *Harper*, these factors do not clearly support applying our decision overruling *Lujan-Armendariz* non-retroactively; indeed, one factor weighs heavily against a prospective-only application. In addition, both practical and jurisprudential considerations strongly encourage compliance with the Supreme Court's preferred approach of full retroactivity.

## A

The first factor in the *Chevron Oil* test is whether "the decision to be applied nonretroactively . . . establish[es] a new principle of law, either by overruling clear past precedent on

---

in *Landgraf v. USI Film Products*, in which the Court stated that "[w]hile it was accurate in 1974 to say that a new rule announced in a judicial decision was only *presumptively* applicable to pending cases, we have since established a firm rule of retroactivity." 511 U.S. 244, 279 n.32 (1994) (citing *Harper*, 509 U.S. 86; *Griffith*, 479 U.S. 314).

[3]Another restriction on non-retroactivity, not at issue here, is that a new rule of law must always be applied retroactively where it concerns our jurisdiction. *See United States ex rel. Haight v. Catholic Healthcare W.*, 602 F.3d 949, 953 (9th Cir. 2010) (citing *United States ex rel. Eisenstein v. City of New York*, 129 S. Ct. 2230 (2009)).

which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed." *Chevron Oil*, 404 U.S. at 106 (citation omitted). Construed narrowly, this first factor aims at identifying those judicial decisions that unexpectedly enunciate a novel principle of law which may unfairly take litigants by surprise. Our abrogation of *Lujan-Armendariz* does not meet this criteria; instead, it brings our circuit in line with the rest of the nation. *Lujan-Armendariz* has long been an outlier in the context of national immigration law; as noted by the majority, since it was decided, "the BIA and every sister circuit to . . . address[ ] the issue—eight in total" have soundly rejected its holding.[4] Maj op. at 9484. Given this context, the majority's decision hardly establishes a "new principle of law." *Chevron Oil*, 404 U.S. at 106. To the contrary, the demise of *Lujan-Armendariz* (at the hands of Congress, the Supreme Court, or the en banc Ninth Circuit) has been "clearly foreshadowed." *Id.* Because the majority is taking the unsurprising step of conforming our case law to the rest of the nation rather than adopting an unanticipated new legal rule, this factor does not weigh heavily in favor of non-retroactive application of its decision.

## B

The second factor requires us to "weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospec-

---

[4]Our sister circuits have consistently rejected our position. *See Wellington v. Holder*, 623 F.3d 115, 120-22 (2d Cir. 2010) (per curiam), *petition for cert. filed*, 79 U.S.L.W. 3442 (U.S. Jan. 18, 2011) (No. 10-933); *Danso v. Gonzales*, 489 F.3d 709, 716-17 (5th Cir. 2007); *Ramos v. Gonzales*, 414 F.3d 800, 805-06 (7th Cir. 2005); *Resendiz-Alcaraz v. U.S. Att'y Gen.*, 383 F.3d 1262, 1271-72 (11th Cir. 2004); *Elkins v. Comfort*, 392 F.3d 1159, 1162-64 (10th Cir. 2004); *Acosta v. Ashcroft*, 341 F.3d 218, 224-27 (3d Cir. 2003); *Vasquez-Velezmoro v. INS*, 281 F.3d 693, 697-98 (8th Cir. 2002); *cf. Herrera-Inirio v. INS*, 208 F.3d 299, 304-09 (1st Cir. 2000).

tive operation will further or retard its operation." *Id.* at 106-07.[5] This factor strongly supports retrospective operation.

As the majority acknowledges, Congress's enactment of a broad definition of "conviction" in IIRIRA, *see* 8 U.S.C. § 1101(a)(48)(A), clearly expressed its intent "that convictions for state-law simple possession have adverse immigration consequences" even if those convictions are later expunged by the state courts. Maj. op. at 9493. In holding that such a result would violate the equal protection rights of aliens convicted of state offenses, *Lujan-Armendariz* frustrated the realization of Congress's intent. Today, the majority announces that, contrary to *Lujan-Armendariz*, "the constitutional guarantee of equal protection does not require treating, for immigration purposes, an expunged state conviction of a drug crime the same as a federal drug conviction that has been expunged under the FFOA." Maj. op. at 9486. This ruling finally frees immigration judges, the BIA, and this court to apply § 1101(a)(48)(A) as Congress intended and as it has been applied for over a decade outside the Ninth Circuit. By overruling *Lujan-Armendariz* only prospectively, however, the majority further delays giving effect to a law that Congress enacted over ten years ago, even while the majority repudiates *Lujan-Armendariz*'s equal protection analysis. The only reasonable conclusion is that the delay caused by this prospective application "retard[s]" the operation of the majority's new rule. *See Chevron Oil*, 404 U.S. at 107.

The majority's contrary conclusion is based on its "assumption" that Congress could not have intended to apply the stat-

---

[5]This factor was adopted from *Linkletter*, which considered whether the exclusionary rule established by *Mapp v. Ohio*, 367 U.S. 643 (1961), should be applied retroactively to cases that were already final. In determining that the purpose of the *Mapp* rule would not be served by its retroactive application, the Court noted the purpose of the exclusionary rule was the "deter[rence of] lawless police action," a purpose that would not "at this late date be served by the wholesale release of the guilty victims." *Linkletter*, 381 U.S. at 636-37.

ute to aliens who may have waived their constitutional rights in reliance on our erroneous precedent. *See* Maj. op. at 9493. This assumption, of course, arises solely from the majority's belief that Congress would balance the equities the same way it does. But we must discern Congress's intent from the language of the statutes it enacts, not from our own perspectives on policy. *See United States v. Gonzales,* 520 U.S. 1, 9-10 (1997) (noting that where "the straightforward language" of a statute "leaves no room to speculate about congressional intent," courts should not "carve out statutory exceptions based on judicial perceptions" of good policy). There is no support in the statute for the majority's claim that "retroactive application will not further the rule's operation." Maj. op at 9493. Indeed, by substituting its own intent for that of Congress, the majority usurps Congress's legislative "prerogative" to make its enactments "retroactive or prospective as [it] see[s] fit," *Harper*, 509 U.S. at 95, and effectively eliminates *Chevron Oil*'s second factor for any case where a statute is involved (because a court can always impute its own views on equity to Congress). This approach is contrary to *Chevron Oil* and also expands its scope, contrary to *Harper*.

C

The third factor instructs us to inquire whether our decision "could produce substantial inequitable results if applied retroactively." *Chevron Oil*, 404 U.S. at 107 (internal quotation marks omitted). Given the diversity of relief provided by state expungement statutes, including statutes that allow expungement even when an alien is convicted of drug offenses at trial, *see, e.g.*, Cal. Penal Code §§ 1210, 1210.1(e), it is impossible to know the extent to which aliens waived their constitutional rights in reliance on *Lujan-Armendariz*. *See* Maj. op. at 9492-93. But even assuming that aliens did waive their trial rights in the expectation of subsequently avoiding immigration consequences for their offenses, and that defeating such expectations would produce inequitable results, a full consideration of the equities cannot ignore the inequities that will

result from the majority's application of its new rule non-retroactively. The majority's decision will create significant inequities between aliens in the Ninth Circuit who were convicted before the date of this decision and who subsequently had those convictions expunged, and all other aliens with expunged convictions everywhere in the country. The aliens in the first group, whether they actually relied on *Lujan-Armendariz* or not, could avoid the immigration consequences of their convictions, while all those in the second group would be deemed to have "convictions" under the plain language of § 1101(a)(48)(A) and would have to suffer such consequences. In short, the majority's decision will lead to "similarly situated" aliens being treated differently in the future, *Harper*, 509 U.S. at 95 (internal quotation marks omitted), with no basis in the Constitution or the statute for the difference.

The majority exacerbates this inequity by choosing to overrule *Rice v. Holder*, 597 F.3d 952 (9th Cir. 2010), retroactively, *see* Maj. op. at 9494-95, while overruling *Lujan-Armendariz* and its other progeny only prospectively, *see* Maj. op. at 9487, 9494-95. Under *Harper*, because the majority applies its new rule abrogating *Rice* to Nunez-Reyes, this abrogation "must be given full retroactive effect in all cases still open on direct review." *Harper*, 509 U.S. at 97. In other words, the majority has singled out one unlucky sub-class (aliens who may have relied on *Rice*) from the larger class it has created (aliens who may have relied on *Lujan-Armendariz* and its progeny) with no apparent justification other than the fact that Nunez-Reyes's case happened to fall within the purview of *Rice*.[6] This runs directly counter to the Supreme

---

[6] The majority gives two explanations for its inconsistent treatment of *Rice*, neither of which is persuasive. First, the majority asserts that *Rice* was more wrongly decided than *Ramirez-Altamirano v. Holder*, 563 F.3d 800 (9th Cir. 2009), and *Cardenas-Uriarte v. INS*, 227 F.3d 1132 (9th Cir. 2000), because the state offense at issue in *Rice* (being under the influence) is less like the federal offense covered by FFOA (simple possession)

Court's statement in *Harper* that courts must not allow "the substantive law [to] shift" according to "the particular equities of [an individual party's] claim[ ]." *Id.* (internal quotation marks omitted).

Given that applying our decision overruling *Lujan-Armendariz* non-retroactively creates "substantial inequitable results" among similarly situated aliens, *Chevron Oil*'s third factor does not weigh heavily in favor of a non-retroactive application.[7]

---

than is the state offense at issue in *Ramirez-Altamirano* and *Cardenas-Uriarte* (possession of drug paraphernalia). As the majority explains, while possession of paraphernalia is a "'possession crime," being under the influence does not involve any kind of "possession,"and thus it is"qualitatively different from any federal conviction for which FFOA treatment would be available." Maj. op. at 9494-95. Moreover, the majority asserts that possession of drug paraphernalia is a "lesser offense" than simple possession, whereas being under the influence is not. *Id.* at 9495. But this analysis is completely immaterial, given that all three of these cases, along with *Lujan-Armendariz*, were wrongly decided because of the same erroneous equal protection analysis; therefore, the majority's comparison of the types of offenses expunged in these cases does not help answer the question why only one of these wrong decisions should be overruled retroactively.

Second, the majority notes that'[t]he parties and amici have presented no evidence that litigants have relied on our very recent decision in *Rice*." Maj. op. at 9495 n.7. This purported distinction of *Rice* is also unpersuasive: the parties and amici provided as much "evidence" of reliance on *Rice* as they did of reliance on any of the other cases. In a word: none. Rather, the "evidence" of reliance cited by the parties and amici amounted to little more than assertions that the defense bar knew of our prior case law and so informed their clients. Of course, that case law included not only *Lujan-Armendariz*, but also its progeny. *See, e.g.*, Brief for Drug Policy Alliance et al. as Amici Curiae Supporting Petitioner at 6 n.4, 9, *Nunez-Reyes v. Holder*, No. 05-74350 (9th Cir. Oct. 29, 2010) (explaining that "established criminal defense practice in states within the Ninth Circuit" is based on "the *Lujan-Armendariz* line of decisions," which includes *Lujan-Armendariz* and eight other decisions).

[7]In its discussion of *Chevron Oil*'s third factor, the majority repeatedly cites to and quotes from *INS v. St. Cyr*, 533 U.S. 289, 322-23 (2001). *See*

D

In sum, because courts generally "ha[ve] no more constitutional authority in civil cases than in criminal cases to disregard current law or to treat similarly situated litigants differently," *Harper*, 509 U.S. at 97 (quoting *Am. Trucking Ass'ns*, 496 U.S. at 214 (Stevens, J., dissenting)) (internal quotation mark omitted), the *Chevron Oil* exception to retroactivity must be treated as a narrow one. At a minimum, then, we should apply the exception only where all three factors clearly favor prospectivity. Because here the second *Chevron Oil* factor weighs heavily against non-retroactive application, and neither of the other factors provides strong support for a purely prospective decision, *Chevron Oil* does not support the majority's decision.

III

Where the factors of *Chevron Oil* do not overwhelmingly support the disfavored approach of non-retroactive application, we should instead give effect to the "general rule of retrospective effect for . . . constitutional decisions" that the Supreme Court reaffirmed in *Harper*. *Id.* at 94 (quoting *Robinson v. Neil*, 409 U.S. 505, 507 (1973)). Here, practical and

---

Maj. op. at 9490-93. *St. Cyr* is inapposite, however, because it dealt with the retroactive effect of a *statute*, which is presumed to be prospective. *See Landgraf*, 511 U.S. at 266, 272 (holding that in considering the retroactive effect of statutes, we apply a "presumption against retroactiv[ity]," out of a recognition that a "[l]egislature's unmatched powers allow it to sweep away settled expectations suddenly and without individualized consideration"). As the Court made clear in *Harper*, however, we are to apply the opposite presumption (that is, the "general rule of retrospective effect," 509 U.S. at 94) when it comes to *judicial decisions*, because "[t]o do otherwise is to warp the role that we, as judges, play in a Government of limited powers," *Beam*, 501 U.S. at 547 (Blackmun, J., concurring in the judgment). In other words, the Supreme Court's analysis of "reliance" and "fairness" in *St. Cyr*, 533 U.S. at 315-25, cannot dictate our analysis in this case.

jurisprudential considerations also weigh heavily in favor of retroactive application of our ruling.

Practical concerns are crucial in the area of immigration law, because regulating immigration is the prerogative of the legislative branch. *See Garcia-Ramirez v. Gonzales*, 423 F.3d 935, 953 (9th Cir. 2005) (Gould, J., concurring) ("[T]he Constitution gives the superordinate role to Congress, and not to the federal courts, in regulating the flow and content of immigration to the United States."). Because Congress has "exclusive power over immigration," we have frequently stressed the paramount importance of national uniformity in this area. *See Cazarez-Gutierrez v. Ashcroft*, 382 F.3d 905, 912 (9th Cir. 2004) (noting the "strong interest in national uniformity in the administration of immigration laws"); *Kahn v. INS*, 36 F.3d 1412, 1414 (9th Cir. 1994) ("The INA 'was designed to implement a uniform federal policy,' and the meaning of concepts important to its application are 'not to be determined according to the law of the forum, but rather require a uniform federal definition.' " (alteration omitted) (quoting *Rosario v. INS*, 962 F.2d 220, 223 (2d Cir. 1992))). By applying its decision overruling *Lujan-Armendariz* non-retroactively, where there is no constitutional reason for doing so, the majority usurps Congress's authority and derogates from this principle of national uniformity.

The Supreme Court has emphasized the substantial jurisprudential concerns that weigh against non-retroactivity; in fact, the Justices seem to speak directly against the approach adopted by the majority. Justice Souter, joined by Justice Stevens, asserted in *Beam* that "the *Chevron Oil* test cannot determine the choice of law by relying on the equities of the particular case." *Beam*, 501 U.S. at 543 (Souter, J., announcing the judgment of the Court). Justice Blackmun, joined by Justices Marshall and Scalia, wrote that "[t]he nature of judicial review constrains us to consider the case that is actually before us, and, if it requires us to announce a new rule, to do so in the context of the case and apply it to the parties who

brought us the case to decide." *Id.* at 547 (Blackmun, J., concurring in the judgment of the Court). Justice Scalia recognized that judges in a real sense "make" law, but stated that "they make it *as judges make it*, which is to say *as though* they were 'finding' it—discerning what the law *is*, rather than decreeing what it is today *changed to*, or what it will *tomorrow* be." *Id.* at 549 (Scalia, J., concurring in the judgment). These perspectives commanded a majority of the Court in *Harper*. Where, as here, the *Chevron Oil* factors do not clearly support non-retroactivity, the majority's insistence that our ruling be given only prospective application cannot be squared with *Harper* and with the Justices' underlying concerns.[8]

Instead of straining to make the law fit its notion of good policy, the majority should have followed the advice of *Harper* and reserved prospective decisionmaking for the rare case where all three Chevron Oil factors clearly point toward doing so. Because the majority has abjured this wiser course, I respectfully dissent.

---

PREGERSON, Circuit Judge, with whom Judge B. FLETCHER joins, dissenting:

*Lujan-Armendariz v. INS*, 222 F.3d 728 (9th Cir. 2000), holds that equal protection of the laws is violated by denying Federal First Offender Act ("FFOA") relief to aliens whose

---

[8]A further explanation of the benefits of a firm rule of retroactivity is set forth in Shannon, *supra* note 2. Professor Shannon concludes that a firm rule of retroactivity: (1) "is more in accord with the nature of the adjudicative function than alternatives"; (2) "is consistent with traditional understandings of the distinction between holding and dicta"; (3) "is . . . consistent with traditional understandings of the doctrine of stare decisis"; and (4) "is superior to prospectivity-based approaches because it better furthers private ordering, fair and efficient adjudication, and public confidence in the judiciary." *Id.* at 836-37.

first-time minor drug offenses were expunged by a state-court judge after the offender successfully completed a state-approved rehabilitation program. The majority overturns this well-established circuit precedent and in doing so overturns a number of our cases that followed the *Lujan-Armendariz* rule. In addition to the three-judge panel opinion in this case, these overturned cases include *Rice v. Holder*, 597 F.3d 952 (9th Cir. 2010), *Romero v. Holder*, 568 F.3d 1054 (9th Cir. 2009), *Ramirez-Altamirano v. Holder*, 563 F.3d 800 (9th Cir. 2009), *Dillingham v. INS*, 267 F.3d 996 (9th Cir. 2001), and *Cardenas-Uriarte v. INS*, 227 F.3d 1132 (9th Cir. 2000). The majority throws out more than ten years of our precedent without so much as a cursory examination of the question whether Congress intended to maintain FFOA treatment for state-expunged first-time minor drug offenses. Specifically, the majority fails to address the question whether Congress's 1996 definition of "conviction," set forth under § 1101(a)(48)(A) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101(a)(48)(A), includes court-ordered expungements at all. The majority skips over this statutory interpretation question and improperly jumps to the constitutional equal protection question instead. *See, e.g.*, *Standard Oil Co. of California v. Arizona*, 738 F.2d 1021, 1023 (9th Cir. 1984) ("[W]e must, if at all possible, resolve cases on statutory grounds before reaching constitutional questions") (citing *Escambia County, Fla. v. McMillan*, 466 U.S. 48, 51 (1984) (per curiam)).

To make matters worse, the majority denies the petition for review in this case even though it decides to apply its new rule denying state offenders FFOA relief for state-expunged first-time drug convictions prospectively only. The result is that the petitioner will be separated from his citizen wife and two American-born children because of a minor drug conviction—one that a California state judge expunged because the petitioner successfully completed a state rehabilitation program. Such a result is unjust. The majority compounds that injustice by ensuring that thousands of minor

drug offenders will suffer the same cruel separation from their families in the days ahead.

America is a second-chance nation. Each year, thousands of people, some of them immigrants to this country, are caught up in our justice system by making the mistake of committing a minor drug offense. But Congress through the FFOA has seen fit to give those folks who commit the most minor drug offenses an opportunity—a second chance— to redeem themselves through rehabilitation, and thereafter walk a straight and narrow path to become productive members of society and a credit to their families. For some immigrants, including thousands of lawfully-admitted residents, this second chance also means being able to stay in the country with their families intact. The majority's abandonment of our precedent today means that first-time minor drug offenders within our circuit who have fully complied with their state's stringent rehabilitation programs, and who have had their minor convictions expunged by a state court judge, nonetheless will be subject to removal from the United States. For them, there will be no second chance. Thousands of families will be rendered asunder, and tens of thousands of American-born children will suffer the consequences. This harsh result, I submit, is repugnant to the values of kindness, compassion, and fundamental fairness.

I therefore strongly dissent.

## A.

This dissenting opinion starts out where the majority should have, by examining the Board of Immigration Appeal's ("BIA") decision in the case now before us. Analyzing Nunez-Reyes's petition for review, I adhere to *Lujan-Armendariz* and its progeny. Because the majority walks away from the *Lujan-Armendariz* rule only prospectively,[1] the

---

[1]Because I believe that the rule articulated in *Lujan-Armendariz* should be upheld, I do not reach the question whether the majority's new rule should apply only prospectively.

majority's pronouncement does not apply to Nunez-Reyes's case.

Flavio Nunez-Reyes ("Nunez-Reyes") is a thirty-five-year-old national of Mexico who entered the United States without inspection in 1992. His United States citizen wife and two American-born children reside in San Jose, California.

In 2001, Nunez-Reyes was charged with one felony count of possession of methamphetamine, in violation of California Health & Safety Code § 11377(a). This felony charge was later reduced to a misdemeanor. Nunez-Reyes was also charged, under the same complaint, with using or being under the influence of methamphetamine, in violation of California Health & Safety Code § 11550(a). The charges against Nunez-Reyes were ultimately dismissed pursuant to California's expungement statute for drug possession offenses, which states that the state court "shall . . . set aside [the conviction] and . . . dismiss the indictment" if the defendant successfully completes probation and that "both the arrest and the conviction shall be deemed never to have occurred." Cal. Penal Code § 1210.1(e)(1).[2]

In early 2002, the federal government charged Nunez-Reyes under 8 U.S.C. § 1182(a)(6)(A)(I) as a removable alien. Nunez-Reyes conceded removability but applied for adjustment of status, cancellation of removal, and, alternatively, voluntary departure. The Immigration Judge ("IJ") held that the state conviction rendered Nunez-Reyes ineligible for any form of relief. The BIA affirmed the IJ's decision and held that Nunez-Reyes could not avail himself of relief under the FFOA because his conviction for using or being under the influence of methamphetamine was "not one for which federal first offender treatment would be available." The BIA reasoned that the FFOA applies only to simple possession

---

[2]California Penal Code § 1210.1 (2006) codifies the Substance Abuse and Crime Prevention Act, also known as "Proposition 36."

offenses, and that being under the influence of methamphetamine is not a simple possession offense. While recognizing that our court has applied FFOA treatment to convictions for "lesser offenses," the BIA held that Nunez-Reyes had not pleaded down from a charge of simple possession and that being under the influence of methamphetamine is not a "lesser offense" than that of simple possession.

The matter came before our court on appeal. Under de novo review, we faithfully applied our precedent, which holds that state-expunged first-time drug possession dispositions that would be eligible for FFOA treatment are not convictions for purposes of the immigration laws. *Nunez-Reyes v. Holder*, 602 F.3d 1102, 1104 (9th Cir. 2010) (per curiam) (*citing Lujan-Armendariz*, 222 F.3d at 734-49, and *Garberding v. INS*, 30 F.3d 1187, 1190 (9th Cir. 1994)). Under the law of our circuit, FFOA treatment also applies to a "lesser offense" than that of simple possession of a controlled substance. *See Cardenas-Uriarte v. INS*, 227 F.3d 1132, 1137 (9th Cir. 2000) (noting that congressional intent indicated that the lesser crime of possession of drug paraphernalia should be given FFOA treatment). Thus, under the FFOA,

> an alien cannot be deemed "convicted" for immigration purposes if he can demonstrate that (1) the conviction was his first offense; (2) he had not previously been accorded first offender treatment; (3) his conviction was for possession of drugs, or an equivalent or lesser charge such as possession of drug paraphernalia . . . ; and (4) he received relief under a state rehabilitative statute.

*Ramirez-Altamirano*, 563 F.3d at 812 (citation omitted). Nunez-Reyes easily met the first, second, and fourth requirements for FFOA relief. The only question left for the panel was whether Nunez-Reyes's conviction for using or being under the influence of methamphetamine was an "equivalent or lesser charge" than simple possession of drugs.

Importantly, the panel relied on our court's recent decision in *Rice v. Holder*, 597 F.3d 952, 957 (9th Cir. 2010), where we held that a misdemeanor conviction for being under the influence of a controlled substance qualifies as a "lesser offense" eligible for FFOA treatment. In *Rice*, the petitioner was charged with one felony count of possession of cocaine and one misdemeanor count of using or being under the influence of a stimulant under California law.[3] *Id.* at 954. Rice pleaded nolo contendere and was convicted of both offenses. *Id.* Upon completion of three years of probation, the court set aside Rice's pleas of nolo contendere, entered pleas of not guilty, and dismissed the complaint. *Id.* During removal proceedings, the IJ found Rice statutorily ineligible for cancellation of removal because he had been convicted for violating a controlled substance law. *Id.* The BIA dismissed Rice's appeal, holding that Rice would not have been eligible for FFOA treatment for the offense of being under the influence of a controlled substance because only simple possession offenses were eligible for relief, and thus, Rice stood convicted for immigration purposes. *Id.*

In *Rice*, we granted the petition for review and held that "persons convicted of using or being under the influence of a controlled substance, where that offense is less serious than simple drug possession, are eligible for the same immigration treatment as those convicted of drug possession under the FFOA." *Id.* at 957. Following the precedent set forth in *Cardenas-Uriarte*, 227 F.3d at 1137, we reasoned that there was "no relevant distinction . . . between the offenses of possession of drug paraphernalia and using or being under the influence of a controlled substance, as both are generally less serious than simple possession." *Rice*, 597 F.3d at 956; *see also Medina v. Ashcroft*, 393 F.3d 1063, 1066 (9th Cir. 2005). We further noted that "we can be sure that using or being

---

[3]This misdemeanor count of using or being under the influence of a stimulant was the same violation for which Nunez-Reyes was convicted under California Health & Safety Code § 11550(a).

under the influence of a controlled substance is a lesser offense because it is a misdemeanor while possession of cocaine is a felony."[4] *Id.* (internal marks and citation omitted). The BIA's decision in Nunez-Reyes's case was rendered before our well-reasoned decision in *Rice*.

As Judge Graber's concurrence to the panel opinion correctly points out, *Rice* "answered the legal questions raised in [Nunez-Reyes's] case, and *no factual distinction exists*." *Nunez-Reyes*, 602 F.3d at 1105 (Graber, J., concurring) (emphasis added). According to our precedent, then, Nunez-Reyes is eligible for FFOA treatment and his state-expunged convictions cannot be used as grounds to deny him relief from removal. The three-judge panel granted Nunez-Reyes's petition and remanded for further proceedings. *Id.* The panel got it right.

Yet, Judge Graber's en banc majority opinion now holds that Nunez-Reyes's petition for review should be denied. It does so by overruling *Rice*, reasoning that "being under the influence is not a lesser crime than simple possession" because it is "not a possession crime at all, and it is thus qualitatively different from any federal conviction for which FFOA treatment would be available." Maj. Op. at 9495. The majority further reasons that "[b]eing under the influence is not a lesser offense to simple possession because it arguably is more serious than mere possession . . . ." Maj. Op. at 9495.

The majority's reasoning is flawed. "Our review is limited to the actual grounds relied upon by the BIA." *Ramirez-Altamirano v. Holder*, 563 F.3d 800, 804 (9th Cir. 2009) (citation omitted). "If we conclude that the BIA's decision cannot be sustained upon its reasoning, we must remand to allow the

---

[4]A person convicted of using or being under the influence of a controlled substance in violation of California Health & Safety Code § 11550(a) "is guilty of a misdemeanor and shall be sentenced to serve a term of not less than 90 days or more than one year in a county jail."

agency to decide any issues remaining in the case." *Id.* The BIA distinguished this case from *Lujan-Armendariz* because Nunez-Reyes was charged and "convicted under California law for using or being under the influence of methamphetamine." The BIA found Nunez-Reyes's conviction for using or being under the influence of methamphetamine "not analogous to any offense for which federal first offender treatment would be available," and therefore held that the conviction's dismissal was "not akin to an FFOA expungement." In short, the BIA stated that using or being under the influence of methamphetamine did not qualify for FFOA treatment because it was neither a simple possession offense nor a "lesser" offense than simple possession of methamphetamine.

However, "[u]nder these circumstances, concluding that [using or being under the influence of a controlled substance] is not included in the First Offender Act would frustrate congressional intent and lead to an absurd result." *Cardenas-Uriarte*, 227 F.3d at 1137. Congress intended the FFOA "as a limited federal rehabilitation statute that permits first-time drug offenders who commit the least serious type of drug offense to avoid the drastic consequences which typically follow a finding of guilt in drug cases." *Lujan-Armendariz*, 222 F.3d at 735. Nunez-Reyes's conviction for using or being under the influence of methamphetamine is the "least serious type of drug offense." In contrast to Nunez-Reyes's felony possession of methamphetamine charge, his conviction for using or being under the influence of methamphetamine was a *misdemeanor*. *See* Cal. Health & Safety Code §§ 11377(a), 11550(a). And Nunez-Reyes's drug use is not even a federal crime: there is no equivalent federal criminal statute that prohibits using or being under the influence of a controlled substance. *See* 21 U.S.C. §§ 841-865. If being under the influence "arguably is more serious than mere possession . . . [,]" Maj. Op. at 9495, the majority fails to explain why neither Congress nor the State of California chose to treat it as such. Thus, by denying Nunez-Reyes the benefit of FFOA treatment for his expunged conviction for using or being

under the influence of drugs, the majority not only frustrates the intent of Congress but also ignores the criminal statutory schemes of both Congress and California, which both treat using or being under the influence as a "least serious type of drug offense."

Nor does the distinction between simple possession and using or being under the influence of drugs make sense under these circumstances. Congress criminalized the *possession* of drugs, at least in part, because it did not want people to *use* drugs. Thus, given the underlying purpose of the FFOA, the FFOA's rehabilitative scheme logically applies to protect first time drug users, along with first time drug possessors, "against the harsh consequences that follow from a drug conviction." *Lujan-Armendariz*, 222 F.3d at 737.

By way of analogy, we have previously held that 8 U.S.C. § 1227(a)(2)(B)(i)—an exception to the automatic removability of aliens convicted of "a single offense involving possession for one's own use of 30 grams or less of marijuana"—implicitly applies to both possession and actual use of marijuana. *See Medina*, 393 F.3d at 1066. This " 'makes absolute logical sense' " because "use of drugs 'has generally been considered a less serious crime than possession.' " *Id.* (quoting *Flores-Arrellano v. INS*, 5 F.3d 360, 363, n.5 (9th Cir. 1993)). Here, as in *Medina*, "[i]t defies reason to conclude that Congress wanted to protect a person who possessed [methamphetamine] in small amounts *for his own use*, but then wanted to remove him from the country if he did so use it." *Id.* Thus, distinguishing between possession of drugs and their use, allowing only the former to qualify for FFOA treatment, frustrates congressional intent and leads to absurd results.

Moreover, had Nunez-Reyes been prosecuted by the federal government rather than by the State of California, he would have been charged *only* with simple possession of methamphetamine because, as mentioned previously, there is no fed-

eral criminal statute prohibiting using or being under the influence of a controlled substance. *See* 21 U.S.C. §§ 841-865. As we noted in *Rice*, "[a]s with possession of drug paraphernalia, 'Congress would never have considered including' under the FFOA the offense of using or being under the influence of a controlled substance, because no federal statute covers that crime." *Rice*, 597 F.3d at 956 (quoting *Cardenas-Uriarte*, 227 F.3d at 1137, and citing 21 U.S.C. §§ 841-865); *see also Ramirez-Altamirano*, 563 F.3d at 808. In fact, federal law imposes only a *civil penalty* for possession of a controlled substance in "an amount that, as specified by regulation of the Attorney General, is a personal use amount . . . ." 21 U.S.C. § 844a. Thus, Nunez-Reyes would have qualified for FFOA treatment had he been fortunate enough to have been caught by federal agents rather than by state officers.

To support its position, the majority claims that in *Cardenas-Uriarte*, 227 F.3d at 1137, and *Ramirez-Altamirano*, 563 F.3d at 808-09, "it was clear that the conviction was for a 'lesser offense' because the alien was convicted of a single crime that carried a lesser penalty than the crime of simple possession." Maj. Op. at 9494-95. Contrary to this reasoning, however, neither case relies on the number of convictions or on the fact of "possession." In *Cardenas-Uriarte*, possession of drug paraphernalia under Arizona law was considered a "lesser offense" not because it was the only offense the petitioner had pleaded to, but because "it would be a misdemeanor once probation was successfully completed while possession of the drugs would have been a felony." 227 F.3d at 1137. In *Ramirez-Altamirano*, the possession of drug paraphernalia offense under California law was considered a "lesser offense" because "it would be absurd to deny [FFOA] relief to individuals who possess the utensils incidental to drug ingestion but grant relief to those who possess the actual illicit drugs," not because the petitioner pleaded guilty to only the misdemeanor paraphernalia possession charge. 563 F.3d at 809. Thus, in neither case was the number of offenses or

the fact of "possession" dispositive. The majority's conclusion, therefore, remains unsupported.

* * *

It is difficult to square the majority's prospective-only application of the new rule it sets out today with the denial of Nunez-Reyes's petition for review. As the majority recognizes, a substantial number of aliens acted in reliance on *Lujan-Armendariz* when they pleaded guilty to drug crimes under state law. Maj. Op. at 9490-91. Relying on equitable considerations, the majority concludes that we must protect the reliance interests of those state offenders who may have forgone their constitutional rights under the reasonable belief that they would not face harsh immigration consequences for pleading guilty and undergoing rehabilitative drug treatment. Maj. Op. at 9492-94. The majority recognizes that *Lujan-Armendariz* applies to the petitioner, Nunez-Reyes, but still denies his petition for review. The majority fails, however, to distinguish *Lujan-Armendariz* and its progeny from Nunez-Reyes's case. Nor can the majority adequately explain why *Rice* was wrongly decided. Therefore, under *Lujan-Armendariz*, *Cardenas-Uriarte*, *Ramirez-Altamirano*, and *Rice*, I would grant Nunez-Reyes's petition for review.

**B.**

The majority's review of the BIA's opinion flawed. Additionally, it remains unclear why the majority opinion even reaches the issue of *Lujan-Armendariz*'s viability. The BIA, in Nunez-Reyes's case, distinguished *Lujan-Armendariz* to the majority's satisfaction, but, puzzlingly, the opinion devotes the bulk of its efforts to overruling *Lujan-Armendariz*. Because we must limit our review to grounds actually discussed by the BIA, this ruling is out of bounds and entirely improper. *Pascua v. Holder*, ___ F.3d ___, 2011 WL 1024434, at *1 (9th Cir. Mar. 23, 2011).

Moreover, the majority overrules *Lujan-Armendariz* on constitutional grounds without addressing the independent statutory justification, on which *Lujan-Armendariz* expressly relied, for excluding state-expunged dispositions from the definition of "conviction." 222 F.3d at 739-43, 745-46. Prudence counsels that we exert more effort before abandoning such long-established, eleven-year-old precedent.

**1**.

In *Lujan-Armendariz*, based in part on an equal protection analysis, we held that "persons whose offenses would qualify for treatment under the [FFOA] but who are convicted and have their convictions expunged under state laws may not be removed on account of those offenses." 222 F.3d at 732. In so holding, *Lujan-Armendariz* faithfully adhered to congressional intent underlying the FFOA in "permit[ting] first-time drug offenders who commit the least serious type of drug offense to avoid the drastic consequences which typically follow a finding of guilt in drug cases." *Id.* at 735.

Given the FFOA's directive that dispositions eligible for FFOA relief "*shall not be considered a conviction* for the purpose of a disqualification or a disability imposed by law upon conviction of a crime, *or for any other purpose*," 18 U.S.C. § 3607(b) (emphases added), we must give meaning to the statute within the immigration context. As both the majority and the Supreme Court recognize, "deportation is an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes." Maj. Op. at 9491 (citing *Padilla v. Kentucky*, 130 S. Ct. 1473, 1480 (2010)). And there can be little doubt that the "particularly severe 'penalty' " of removal, *id.* at 1481, is one of the most "drastic consequences" that results from a drug conviction. To fully effectuate Congress's intent to insulate first-time drug offenders who complete expungement programs from the extremely harsh consequences that would otherwise result from their actions,

FFOA relief must apply not only to eligible aliens convicted of federal offenses, but also to those convicted of state offenses. Otherwise, the FFOA loses much of its efficacy because the relief it offers can be circumvented via the state criminal justice system.

### 2.

Keeping these principles in mind, even if the equal protection analysis set forth in *Lujan-Armendariz* is abandoned, it does not follow that state-expunged first-time drug offense convictions are ineligible for FFOA treatment. In *Lujan-Armendariz*, we did not consider what effect the 1996 amendment to the term "conviction," promulgated in 8 U.S.C. § 1101(a)(48)(A), had on state expungements specifically. Instead, we held that the 1996 amendment did not repeal the FFOA and we then simply extended this conclusion to state expungements on the basis of equal protection. 222 F.3d at 742-43. Put another way, *Lujan-Armendariz*'s equal protection rationale had necessary force only absent an answer to the question of "what effect the new definition [of conviction] has on state expungements under state rehabilitation laws in general." 222 F.3d at 742. Assuming that *Lujan-Armendariz*'s equal protection analysis no longer stands, we must now engage in this statutory analysis.

Congress's 1996 amendment to the term "conviction" suggests that it had no intention of altering the BIA's decisions to include state- and federally-expunged convictions from that term. The majority, in leaping to the conclusion that equal protection is not violated because Congress *could have* made a decision to treat similarly-situated aliens differently under rational basis review, declines to engage in any analysis, through statutory interpretation or otherwise, of whether Congress *actually* intended to do so. The majority simply assumes that "Congress intended that convictions for state-law simple possession have adverse immigration consequences," Maj. Op. at 9493, but fails to explain from where it divines such

congressional intent. We should not prematurely review Congress's purported distinction between state and federal expungement under a cursory form of rational basis review without first looking at the relevant statutes to determine whether Congress *actually* intended for such a distinction to exist.

In 1996, Congress addressed the meaning of the term "conviction" by enacting the following definition:

> The term "conviction" means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—
>
> (I) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and
>
> (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

8 U.S.C. § 1101(a)(48)(A).

The legislative history behind the 1996 amendment to the definition of "conviction" fully supports the conclusion that state-expunged first-time drug possession offenses are not "convictions" under § 1101(a)(48)(A) of the INA. 222 F.3d at 739-43. In enacting 8 U.S.C. § 1101(a)(48)(A), Congress adopted most of the BIA's definition of "conviction," as it was laid out in *Matter of Ozkok*, 19 I. & N. Dec. 546, 551-52 (BIA 1988). Notably, the amended definition makes no mention of "the rule, cited with approval by the BIA in *Ozkok*, that *expunged* convictions *cannot* serve as the basis for deportation." *Lujan-Armendariz*, 222 F.3d at 742 n.23. Moreover, Congress promulgated its new definition of "conviction" just

after the BIA reaffirmed its rule that immigration consequences do not attach to state-expunged first-time drug possession offenses, and that they would be treated the same as federal convictions expunged under the FFOA. *See Matter of Manrique*, 21 I. & N. Dec. 58, 64 (BIA 1995). As amicus points out, when Congress adopts an agency interpretation, Congress intends the agency construction to be incorporated into the statute. *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 804, 813 (1989) (When Congress "codifies a judicially defined concept, . . . absent an express statement to the contrary, . . . Congress intended to adopt the interpretation placed on that concept by the courts."); *Lorillard v. Pons*, 434 U.S. 575, 581 (1977) (the presumption that Congress acted with knowledge is particularly appropriate where Congress "exhibited both a detailed knowledge of the [incorporated] provisions and their judicial interpretation and a willingness to depart from those provisions regarded as undesirable or inappropriate for incorporation."); *Hing Sum v. Holder*, 602 F.3d 1092, 1099-1101 (9th Cir. 2010) (Where Congress uses terms that have settled meanings in BIA case law, "Congress means to incorporate the established meaning of these terms.").

We have previously acknowledged that the 1996 amendment to the definition of "conviction" in § 1101(a)(48)(A) "said nothing about expungement, and could well be interpreted to establish only *when* a conviction occurred without determining what might be the effect of a later expungement." *Murillo-Espinoza v. INS*, 261 F.3d 771, 774 (9th Cir. 2001) (citing to *Lujan-Armendariz*, 222 F.3d at 741-42). And, notably, consistent with every other circuit, the majority does not overrule *Lujan-Armendariz*'s holding that the 1996 amendment to the definition of "conviction" in § 1101(a)(48)(A) of the INA did not expressly or impliedly repeal the FFOA. Its holding thereby leaves intact the FFOA's exception for expunged first-time controlled substance offenses from the definition of "conviction." *See Lujan-Armendariz*, 222 F.3d at 737.

Thus, in enacting the 1996 amendment, "it appears that Congress was concerned primarily . . . with the question whether aliens could be deported during the period that followed a determination of guilt but preceded the expungement of the offense," but had no intention of altering the longstanding rule that convictions that are subsequently expunged under either federal or state law "no longer have any effect for immigration" purposes. *Id.* at 742 n.23. Congress's decision to enact essentially verbatim the majority of *Ozkok*'s definition of conviction, while excluding only one part of that definition that has no bearing here, makes it particularly appropriate to read § 1101(a)(48)(A) as incorporating the agency's treatment of expunged convictions. Evidently, Congress *approved* the rule established by the BIA in *Manrique* and recognized in *Ozkok*.

An analysis of the relevant statutes and their history reveals an independent justification for excluding first-time minor drug offenses expunged under state law from the definition of "conviction" in § 1101(a)(48)(A). Congress evidently approved of the long-standing principle that state-expunged first-time simple possession convictions do not carry adverse immigration consequences and, in enacting the 1996 amendment, had no intention of disturbing it.

**3.**

In failing to reach this statutory question and instead relying only on its equal protection analysis, the majority implicitly defers to the BIA's post-1996 interpretation of "conviction," which followed the promulgation of § 1101(a)(48)(A) of the INA. *See, e.g.*, *Murillo-Espinoza*, 261 F.3d at 774 (according *Chevron* deference to the BIA's "permissible construction of the [INA] statute").

After the 1996 amendments to § 1101(a)(48)(A), the BIA reversed its previous course and held that the 1996 definition of "conviction" includes convictions expunged under state

rehabilitative statutes. *In re Salazar-Regino*, 23 I. & N. Dec. 223, 235 (BIA 2002) (en banc). Pursuant to this interpretation, the BIA, since 2002, has refused to follow in other circuits our circuit's application of FFOA treatment to first-time drug offenses expunged under state law. *Id.* at 235 (stating that the BIA "decline[s] to apply the ruling in [*Lujan-Armendariz*] to cases arising outside of the jurisdiction of the Ninth Circuit"). In so doing, the BIA has implicitly rejected the statutory rationale for treating state and federal expungements equally, and has instead relied only on the equal protection holding of *Lujan-Armendariz* on appeals within this circuit.

We need not, however, defer to the BIA's interpretation of the term "conviction" as it is used in § 1101(a)(48)(A). Deference to the BIA's interpretation of a "statute which it administers" is proper under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984). Deference to the BIA's interpretation of the definition of "conviction" as used in § 1101(a)(48)(A), however, is entirely inappropriate, because that term is used not only for purposes of immigration law, but also in the criminal law context. Specifically, § 1101(a)(48)(A)'s definition of conviction controls the meaning of the term in the federal illegal reentry statute, 8 U.S.C. § 1326, and is correspondingly referenced in the United States Sentencing Guidelines. Because "a criminal statute[ ] is not administered by any agency but by the courts," its interpretation is our independent responsibility. *Crandon v. United States*, 494 U.S. 152, 177 (1990); *see also de Jesus Melendez v. Gonzales*, 503 F.3d 1019, 1023 (9th Cir. 2007) (stating that no deference is owed to the BIA's interpretation of statutes it does not administer, including the FFOA).

The Supreme Court has decided many cases concerning the term "aggravated felony"—which, like "conviction," is defined in § 1011(a) and used in § 1326—without deferring to the BIA and without applying the *Chevron* framework. *See, e.g.*, *Carachuri-Rosendo v. Holder*, 560 U.S. __, 130 S. Ct. 2577 (2010); *Nijhawan v. Holder*, 129 S. Ct. 2294 (2009);

*Lopez v. Gonzales*, 549 U.S. 47 (2006); *Leocal v. Ashcroft*, 543 U.S. 1 (2004). Similarly, here, we must conduct our own interpretation of the statute and need not defer to the BIA's interpretation of "conviction." Because construction of this term has consequences for the administration of criminal law, it is the independent duty of the judiciary, and not the BIA, to assign to the term a meaning.

Relatedly, even if, in discharging our duty, we were to find that § 1101(a)(48)(A) is ambiguous, its application in the criminal law context requires us to "resolve the ambiguity favorably to the alien, pursuant to the principle of lenity applicable with respect to the gravity of removal." *Retuta v. Holder*, 591 F.3d 1181, 1189 (9th Cir. 2010) (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987), and *Lara-Cazares v. Gonzales*, 408 F.3d 1217, 1221 (9th Cir. 2005)). The majority entirely fails to consider how its holding will apply to criminal laws.

## C.

As the previous analysis reveals, an independent statutory justification can rescue the state-expungements holding of *Lujan-Armendariz* and its progeny. Nonetheless, that decision was properly decided on the basis of its equal protection analysis. I reject the majority's equal protection analysis in this case, by which it overrules *Lujan-Armendariz*.

The rule we articulated in *Lujan-Armendariz* derives from our holding in *Garberding v. INS*, 30 F.3d 1187, 1191 (9th Cir. 1994). Under *Garberding*, "persons who received the benefit of a state expungement law were *not* subject to deportation as long as they *could* have received the benefit of the [FFOA] if they had been prosecuted under federal law." *Lujan-Armendariz*, 222 F.3d at 738. *Garberding*'s equal protection analysis focused on whether similarly-situated aliens could be treated differently based on their conduct. *Id.* "*Garberding* . . . establishes that aliens may *not* be treated differ-

ently based on the 'mere fortuity' that they happen to have been prosecuted under state rather than federal law, or under different state laws, as there is no rational basis for distinguishing among the affected groups." *Id.* at 748. *Lujan-Armendariz* simply adopted and applied that same principle after finding that Congress's new definition of "conviction" had not repealed the FFOA's first-time offense exception. *Id.* at 742. We applied equal protection because "no rational basis exists for affording [FFOA] relief to an alien under federal expungement law while denying relief to identically situated aliens who qualify for similar treatment under state expungement laws." *Id.* at 743 n.24.

## 1.

The majority offers two purportedly rational bases for not extending FFOA treatment to aliens whose convictions have been expunged under state law. First, the majority adopts the rationale offered by the Third Circuit in *Acosta v. Ashcroft*, 341 F.3d 218, 227 (3d Cir. 2003), that

> Congress may have been unfamiliar with the operation of state schemes that resemble the FFOA. Congress could have worried that state criminal justice systems, under the pressure created by heavy case loads, might permit dangerous offenders to plead down to simple possession charges and take advantage of those state schemes to escape what is considered a conviction under state law.

This rationale, however, is belied by the fact that the FFOA requires that the offender "has not, prior to the commission of [a simple possession] offense, been convicted of violating a Federal or State law relating to controlled substances." 18 U.S.C. § 3607(a)(1). If Congress was worried that state criminal justice schemes, overwhelmed by heavy caseloads, might allow dangerous offenders to plead down, they presumably also recognized that offenders could simply plead to some-

thing other than a violation of a controlled substances law and thereby achieve the same result.

Moreover, the Supreme Court has recently held, in the context of determining what constitutes an "aggravated felony," that the immigration consequences of state convictions must be applied as if the offense had been prosecuted in federal court. *See Lopez v. Gonzales*, 549 U.S. at 47; *Carachuri-Rosendo*, 130 S. Ct. at 2577. If Congress is willing to acknowledge that state convictions have force in the federal immigration context, it seems wholly inconsistent to assume that Congress intended to treat state expungements differently.

**2.**

The second purportedly rational basis offered by the majority is slightly more plausible. Because not all states have expungement schemes, the majority offers, "Congress reasonably could have concluded that, in the strong interest in uniformity, it would not recognize *any* state expungements rather than adopt a piecemeal approach." Maj. Op. at 9486 (citing *Nunez-Reyes*, 602 F.3d at 1107 (Graber, J., concurring)).

This rationale, however, is also flawed. First, under the majority's reasoning, Congress's hypothetical interest in uniformity cuts both ways. The majority opinion assumes that Congress's interest in uniformity in the immigration context requires leveling down to the lowest common denominator and excluding all state-expunged convictions from FFOA treatment. But the FFOA ensures its own uniformity by providing that all offenses expunged under the Act will not be regarded as convictions "for any . . . purpose." 18 U.S.C. § 3607(b). There is no reason to believe that Congress's interest in uniformity among the states is more important than Congress's interest in uniformity in the treatment of first-time drug offenders whose convictions have been expunged.

Notably, aliens whose state convictions have been expunged are not similarly situated to those whose states have no expungement schemes in place. Aliens whose convictions were expunged under state expungement schemes have undergone court-mandated rehabilitation. The FFOA was passed to ensure that those first-time offenders who undergo rehabilitative measures and ultimately get their charges dismissed or their convictions expunged are afforded a second chance. The only aliens who meet this criteria are those in states with expungement schemes. Unlike the disparity created by the majority, then, distinguishing between aliens in states with expungement schemes and those in states that do not have expungement schemes survives rational basis review and undermines neither Congress's intent under the FFOA, nor states' rehabilitative schemes.

Second, I note that any alien, from any state, may have his first-time federal drug offense expunged under the FFOA and that offense can no longer be considered as a basis for removal. It is not the case, therefore, that affording state expungements FFOA treatment would render aliens from states without state expungement schemes entirely ineligible for FFOA treatment, while those from states with expungement schemes would qualify for such treatment. Any and all may receive such treatment for federal convictions expunged under the FFOA. To the contrary, then, FFOA treatment of state expungements ensures that aliens from states that offer alternatives to federal expungement programs are not severely punished merely because they were presented with and took such an alternative.

### 3.

There is simply no principled reason why Congress should treat offenses subject to state expungement differently from identical or lesser offenses that would have been eligible for FFOA treatment had they been prosecuted as federal crimes. Equal protection considerations prohibit unequal treatment of

similarly-situated individuals. *See Garberding*, 30 F.3d at 1190. Aliens who have committed identical offenses and have their convictions expunged, whether directly through the FFOA or as a result of a state rehabilitation scheme, are similarly situated. Under *Lujan-Armendariz*, the question has always been whether the expunged offense would have been covered under the FFOA if charged as a federal crime. 222 F.3d at 738 n.18. And we have been consistent in asking and answering that question. *See Ramirez-Altamirano*, 563 F.3d at 810. To do otherwise would be to allow non-citizens' due process rights to hinge on jurisdictional happenstance. As we stated in *Lujan-Armendariz*, "there is no rational basis for a federal statute that treats persons adjudged guilty of a drug offense under state law more harshly than persons adjudged guilty of the identical offense under federal law." *Id.* at 749.

*Lujan-Armendariz*'s equal protection analysis was based in part on the irrationality of treating aliens differently based on the "mere fortuity" whether a federal prosecutor sends a drug case to the state prosecutor or chooses to keep it, or vice versa. 222 F.3d at 738 (citing *Paredes-Urrestarazu v. INS*, 36 F.3d 801, 811 (9th Cir. 1994)). Without the equal treatment afforded under *Lujan-Armendariz*, this unfettered prosecutorial discretion may now be exercised to dispositively determine whether an individual's first-time drug offense will yield extremely harsh immigration consequences; that is, whether any particular defendant will benefit from the FFOA. This result is unsettling, to say the least.

Our precedent requires that we give extra deference to Congress in the immigration context. *Abebe v. Mukasey*, 554 F.3d 1203, 1206 (9th Cir. 2009). But we cannot allow "rational basis review" to serve as a rubber stamp to what a hypothetical Congress might have intended. "Justifications for overruling one of our court's longstanding precedents should be made of sterner stuff. . . . We must place some rational bounds on what survives rational basis review if the constitutional right of equal protection is to have any meaning what-

soever outside the context of suspect classifications." *Id.* at 1210 (9th Cir. 2009) (Clifton, J., concurring); *see also id.* at 1215 (Thomas, J., dissenting) ("[I]n order to be rational, the reason must be consistent[.]"). Until now, employing the rational basis test, we treated similarly-situated first-time drug offenders equally. I see no reason to abandon that practice, particularly when any rational basis now offered is no more or less true today than it was eleven years ago when we decided *Lujan-Armendariz.*

The majority offers what it believes to be some consolation to non-citizen first-time drug offenders: from now on, "aliens will be able to make a fully informed decision whether to plead guilty or to exercise their constitutional rights, such as the right to trial by jury." Maj. Op. at 9492. But it will be of little comfort to aliens charged with first-time possession offenses that their decision to plead or go to trial will be rendered with full awareness of the immigration consequences of such a conviction. Non-citizens will no longer be able to avoid the most drastic consequence of all—removal—by pleading guilty. This will further undermine state rehabilitative schemes because it will remove a tremendous incentive for first-time drug offenders to plead guilty. As amicus point out, this change in the cost-benefit analysis directly eviscerates the effectiveness of states' rehabilitative statutes that, like the FFOA, aim to remove the legal consequences of a minor, first-time drug offense for those offenders who successfully complete their probationary requirements and undergo drug treatment.

Finally, the notion that state expungement programs should be given different or less significant treatment than their federal counterparts is directly at odds with the principle of "comity" and respect for state court proceedings and processes that federal courts have embraced in other areas. *See, e.g.*, *Harrington v. Richter*, 131 S. Ct. 770, 784-86 (2011) (state court proceedings are the "central process" through which federal habeas claims should be adjudicated, and fed-

eral court may not impose requirements that "undercut state practices designed to preserve the integrity of the case-law tradition"). It is lamentable that, while federal courts apply extreme deference to state laws and procedures in contexts where they might serve to frustrate the vindication of constitutional or federally-protected rights, we refuse to recognize state programs in the context where they might serve to trigger the FFOA in a manner completely consistent with congressional intent. *See Beard v. Kindler*, 130 S. Ct. 612, 618-19 (2009) ("In light of . . . federalism and comity concerns . . . it would seem particularly strange to disregard state . . . rules that are substantially similar to those to which we give full force in our own courts."). Though some of our sister circuits may ascribe to Congress little faith in state court rehabilitative schemes, we should not feel so bound. *Cf. Acosta*, 341 F.3d at 227.

## D.

There is one thing on which we all can agree: "Reliance on the clear, binding precedent of *Lujan-Armendariz* strikes us as entirely reasonable and prudent, particularly in light of Congress's inaction, the Supreme Court's steady denial of certiorari in cases raising this issue, and our own consistent application (and, arguably, expansion) of the precedent in a series of cases spanning more than a decade." Maj. Op. at 9492 n.6. To this list of reasons we can add one more: the holding in *Lujan-Armendariz* itself is entirely reasonable and prudent. Moreover, there is no compelling reason why we should overrule *Lujan-Armendariz* without first engaging in a thorough statutory analysis. Such an analysis reveals that Congress never intended to exclude state-expunged first-time drug possession dispositions from the definition of "conviction" in § 1101(a)(48)(A) of the INA.

For all of the foregoing reasons, I would grant Nunez-Reyes's petition for review and hold that his two misdemeanor convictions are eligible for FFOA treatment. While the

rational basis test sets a low bar, there is simply no indication that Congress intended to deny FFOA treatment to aliens with state-expunged first-time minor drug offenses who have successfully undergone a state-approved program that resulted in their rehabilitation. In fact, the majority's opinion serves to undermine Congress's evidenced intent. Unless and until we are willing to engage in a thorough analysis of the definition of "conviction" under the INA, we should adhere to the principle of stare decisis and demonstrate restraint. This is particularly true where, as here, reexamining and casting aside our precedent is unnecessary to deciding the case before us. Because the majority ultimately reaches further than it needs to, without digging deeper than it ought to, I dissent.